UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ANTHRACITE CAPITAL, INC.,               :
                                        :
                    Plaintiff,          :
                                        :       03 Civ. 5219 (DLC)
        -v-                             :
                                        :       <u>OPINION AND ORDER</u>
MP-555 WEST FIFTH MEZZANINE, LLC; MP-   :
808 SOUTH OLIVE MEZZANINE, LLC; ROBERT  :
F. MAGUIRE, III; and "ABC Corp. No. 1"  :
through "ABC Corp. No. 100", the last   :
one hundred names being fictitious and  :
unknown to plaintiff, the persons or    :
parties intended being the persons,     :
companies, or corporations, if any,     :
having or claiming an interest in       :
certain collateral described in the     :
First Amended Complaint,                :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X


Appearances:

For the Plaintiff:

Christopher P. Schueller
Buchanan Ingersoll PC
1 Chase Manhattan Plaza
35th Floor
New York, New York  10005

For Defendants MP-555 West Fifth
Mezzanine, LLC, MP-808 South Olive
Mezzanine, LLC, Robert F. Maguire, III,
Maguire Properties, L.P., and Maguire
Properties, Inc.:

Michael I. Allen
Matthew J. Sava
Shapiro Forman Allen Miller &
McPherson LLP
380 Madison Avenue
New York, New York  10017

J. Michael Hennigan
Peter J. Most
Hennigan, Bennett & Dorman
601 South Figueroa Street, Suite 3300
Los Angeles, California  90017

DENISE COTE, District Judge:

This is a contractual dispute involving, among other things, the refinancing of commercial office property in Los Angeles, California.  Defendant Robert F. Maguire, III ("Maguire"), a prominent real estate investor in Southern California, refinanced debt on a number of properties he indirectly owned while simultaneously reorganizing a number of holding companies for those properties and engaging in an initial public offering of shares in a corporation with an interest in a portfolio of those companies.  As a result of the debt refinancing, plaintiff Anthracite Capital, Inc. ("Anthracite"), the holder of a portion of debt owed by two of Maguire's property companies, seeks to enforce a clause of its governing loan agreement that requires the Maguire companies to pay an "exit fee" upon the "sale" of an office tower and parking garage (the "Property") above a certain price.  The case largely turns on the question of whether the refinancing, reorganization, and initial public offering collectively constitute a "sale" of the Property under the governing loan agreement.  Anthracite and the defendants have cross-moved for summary judgment; Anthracite has also moved to exclude the testimony of the defendants' expert.  For the following reasons, the defendants' summary judgment motion is granted, Anthracite's summary judgment motion is denied, and

2

Anthracite's motion to exclude expert testimony is denied as moot.

**BACKGROUND**

The following facts are undisputed, or viewed in the light most favorable to the party resisting summary judgment, unless otherwise noted.

<u>Parties</u>

Plaintiff Anthracite is a Maryland corporation with its principal place of business in New York, and is a publicly traded Real Estate Investment Trust (REIT) managed by Blackrock, Inc. A REIT is an investment trust that owns and manages a pool of commercial properties, mortgages, and other real estate assets. Anthracite owned a portion of a securitized loan that was made to the defendant organizations.

Defendant Maguire is a California domiciliary and one of the largest owners and operators of first class office properties in Southern California. Prior to June 2003, Maguire directly or indirectly owned properties through over 125 separate entities (collectively, the "Maguire Organization"). The Maguire Organization included, among other companies, defendant MP-555 West Fifth Mezzanine, LLC ("MP-555"), defendant MP-808 South Olive Mezzanine, LLC ("MP-808"), Maguire Partners - 555 West Fifth, LLC ("Partners 555"), Maguire Partners - 808 South Olive, LLC ("Partners 808"), Maguire Properties - 555 West Fifth, LLC

3

("Properties 555"), and Maguire Properties - 808 South Olive, LLC
("Properties 808"). MP-555 owned Partners 555, and MP-808 owned
Partners 808. Partners 555, Partners 808, Properties 555, and
Properties 808 were all single purpose entities intended to hold
title to a property directly, while MP-555 and MP-808 were single
purpose entities intended to hold a controlling interest in a
company that held title to a property directly.

Loan Agreement

Between January 1, 2001 and June 1, 2003, Partners 555 owned
the title to a large commercial office tower in downtown Los
Angeles known as the Gas Company Tower ("Tower"), located at 555
West Fifth Street, and Partners 808 owned the title to the 808
South Olive Street Parking Garage ("Garage"), which is used by
tenants of the Tower and others. Under a Mezzanine Loan
Agreement[1] dated December 20, 2000 ("Loan Agreement"), MP-555 and
MP-808 secured a loan of $61.6 million ("Mezzanine Loan") from
Credit Suisse First Boston Mortgage Capital, LLC ("CSFB") and
German American Capital Corporation ("GACC") with a pledge of MP-
555's and MP-808's membership interests in Partners 555 and
Partners 808. Maguire personally served as guarantor for the
Mezzanine Loan, among other loans. CSFB and GACC conveyed their
ownership of the Mezzanine Loan to a trust ("Mezzanine Trust")
that issued certificates representing beneficial interests in the

---

[1] Mezzanine loans are similar to second mortgages, except
that they are secured by the stock of the company that owns the
property, as opposed to the real estate.

assets of the Mezzanine Trust.  Anthracite purchased a
securitized tranche of the Mezzanine Loan by purchasing Mezzanine
Component A-2 Certificates from the Mezzanine Trust.

Section 10.7 of the Loan Agreement contains, in bold, all
capital letter typeface, the governing law provision.  It reads
as follows:

> This Agreement was negotiated in the State of New York,
> and made by Mezzanine Lender and Accepted by Borrowers
> in the State of New York, and the proceeds of the
> Mezzanine Notes were disbursed from the State of New
> York, which State the Parties agree has a substantial
> relationship to the Parties and to the underlying
> transaction embodied hereby, and in all respects,
> including, without limiting the generality of the
> foregoing, matters of construction, validity and
> performance, <u>this Agreement</u> and the obligations arising
> hereunder <u>shall be governed by, and construed in</u>
> <u>accordance with, the laws of the State of New York</u>
> applicable to contracts made and performed in such
> State (without regard to principles of conflict [of]
> laws) and any applicable law of the United States of
> America, it being understood that, to the fullest
> extent permitted by law, the law of the State of New
> York shall govern the construction, validity and
> enforceability of all Mezzanine Loan Documents and all
> of the Obligations arising hereunder or thereunder.  To
> the fullest extent permitted by law, each borrower
> hereby unconditionally and irrevocably waives any claim
> to assert that the law of any other jurisdiction
> governs the Mezzanine Notes, and the Mezzanine Notes
> shall be governed by and construed in accordance with
> the laws of the State of New York pursuant to Section
> 5-1401 of the New York General Obligations Law.

(Emphasis supplied.)

Section 2.6 of the Loan Agreement dictates the circumstances
under which MP-555 and MP-808 could pre-pay the Mezzanine Loan.
Section 2.6(k) provides for the payment of a "Supplemental Exit
Fee" as follows:

Borrowers[2] shall pay to Mezzanine Lender[3] . . . a supplemental exit fee ("the Supplemental Mezzanine Component A Exit Fee"), <u>payable upon one or more sales of all or any portion of the Property by the Companies</u>[4] (each, a "Supplemental Exit Fee Triggering Event"); <u>provided, however, that no such Supplemental Mezzanine Component A Exit Fee shall be due from Borrowers unless and until</u>, at the time the particular Supplemental Exit Fee Triggering Event occurs, the sum of <u>(i) the Supplemental Exit Fee Purchase Price then due,</u> (ii) any prior Supplemental Exit Fee Purchase Price previously paid to the Companies and (iii) the value of the portion of the Property remaining after the current Supplemental Exit Fee Triggering Event . . . <u>is equal to or greater than $425,000,000</u> . . . . For the purposes of the foregoing, "<u>Supplemental Exit Fee Purchase Price" means the gross purchase price of all or a portion of the Property</u>, including without limitation all cash proceeds, non-cash proceeds, any over-market purchase money financing or any other consideration to the Companies or the Borrowers <u>(provided that any and all consideration received shall be payable only to the Companies or the Borrowers)</u> that is reasonably attributable to the Property . . . .

(Emphasis supplied). The Loan Agreement required MP-555, MP-808, Partners 555, and Partners 808 to remain single purpose entities.

<u>Refinancing, Restructuring, and Offering Stock in the Maguire Organization</u>

In an effort, among other things, to eliminate personal guarantees on debt acquired by Maguire Organization entities, Maguire undertook a strategy of restructuring the Organization, refinancing debt, and offering stock to the public to raise

---

[2] "Borrowers" are defined in the Loan Agreement as MP-555 and MP-808.

[3] "Mezzanine Lender" refers to CSFB and GACC, together with their permitted successors and assigns.

[4] "Companies" are defined in the Loan Agreement as Partners 555 and Partners 808.

capital.  The process of restructuring the Maguire Organization
began on June 26, 2002, when Maguire Properties, Inc. ("MPI") and
Maguire Properties, L.P. ("the Partnership"), a Maryland limited
partnership, were formed, although neither entity had any
material operations or substantial assets until June 27, 2003.
At all relevant times, Maguire was the Chairman and Co-Chief
Executive Officer of MPI.  MPI was established so that common
stock in a Maguire Organization entity could be sold to the
public.  The Prospectus ("Prospectus") for the Initial Public
Offering ("IPO") of stock in MPI indicates that MPI was formed
"to succeed certain businesses of the Maguire Organization."  The
Prospectus also indicates that MPI was formed with the
expectation that it would qualify as a REIT for federal income
tax purposes.  The Partnership was established either to hold
title to Maguire Organization properties directly, or to own the
Maguire Organization entities that held title to such properties.
MPI would hold a majority partnership interest in the
Partnership.

    The owners of a subset of the Maguire Organization entered
into Contribution Agreements with the Partnership wherein they
agreed to contribute properties and interests to the Partnership
in so-called "Formation Transactions."  A Contribution Agreement
dated November 11, 2002 between Maguire and the Partnership, for
example, states that "[t]he Formation Transactions relate to the
proposed initial public offering of the common stock of [MPI],"
and that "[t]he owners of the Property Interests and the partners

and members of the Participating Partnerships will either transfer their unencumbered Property Interests or unencumbered interests in the Participating Partnerships, as applicable, to the Operating Partnership in exchange for cash or . . . for units of limited partnership interest in the Operating Partnership." Under the Contribution Agreement, the parties recite that the Partnership's acquisition of property interests and liabilities "is in connection with and subject to the consummation of the Formation Transactions and the Public Offering." MP-555 and MP-808, were part of these Formation Transactions, such that the ownership interest in those companies would transfer from Maguire to the Partnership.

The contemplated financial consequences of the IPO and Formation Transactions included that purchasers of common stock offered in the IPO would own 98.2% of MPI's common stock, or 74.6% on a fully diluted basis when other stock shares owned by Maguire are included, and MPI would be the sole general partner of the Partnership, owning 77.2% of the Partnership units. The remaining 22.8% of the Partnership units would be owned by limited partners, including a 21.2% interest held by Maguire, and a 1.6% interest held by other officers and directors and unrelated third parties. The allocation of partnership units was not specified in the Contribution Agreements, although the Agreements refer to a minimum number of units to be awarded, and indicate that all units were to be distributed as reasonably determined by Maguire or the Partnership based on the value

contributed by each partnership interest.[5]

In conjunction with the preparations for the Formation Transactions and the IPO, Maguire also initiated plans to refinance portions of debt owed on various properties owned by the Maguire Organization. The Prospectus describes the interrelationship of the three activities as follows:

> Prior to or simultaneously with the completion of this offering, <u>we will engage in formation transactions and related refinancing transactions</u>, which are designed <u>to consolidate the ownership</u> of a portfolio of office and other properties or interests therein and a substantial majority of the commercial real estate management, leasing and development businesses of the Maguire Organization into our operating partnership and our services company, <u>facilitate this offering</u>, enable us to <u>raise</u> necessary <u>capital to repay existing indebtedness</u> related to certain of the properties in our portfolio and other obligations, enable us to qualify as a REIT for federal income tax purposes commencing with the taxable year ending December 31, 2003 and to defer the recognition of gain by certain continuing investors.

(Emphasis supplied.) The Prospectus goes on to state: "Upon consummation of this offering and the related refinancing transactions, we [MPI and the Partnership] will repay a substantial majority of our assumed indebtedness with proceeds from new borrowings and this offering." The Maguire Organization contemplated prepayment on a number of loan obligations including the Mezzanine Loan, and consequently requested a payoff quote on February 27, 2003 from Midland Loan Services ("Midland"), the loan servicer for the Mezzanine Loan. Midland continued to provide updated quotes to Maguire over the next few months with

---

[5] The Partnership and Maguire later decided not to allocate units based on value generated by each property interest.

notice to, and without objection from, Anthracite.  At no point before the IPO on June 27, 2003, did Midland's quotes include the requirement that Maguire, MP-505, or MP-808 pay the Supplemental Exit Fee discussed in Section 2.6(k) of the Loan Agreement.

As part of the refinancing associated with the Tower and the Garage, Maguire sought new mortgage and mezzanine loans on those properties.  The Prospectus states that the "Gas Company Tower and 808 South Olive garage property entities will incur a $250.0 million mortgage loan and a $30.0 million mezzanine loan," and that those "refinancing transactions will be entered into prior to or concurrently with the consummation of this offering."  The only reason proffered by either side for establishing new single purpose entities with no prior liens to hold both properties is that it is a common technical lending requirement for new loans.  Consequently, Properties 555 and Properties 808 were created to receive title to the Tower and Garage, respectively, and to be parties to the Bank of America loans.

On June 27, 2003, the IPO took place, the Formation Transactions were completed, outstanding loans were prepaid, and new loans took effect.  Under the Formation Transactions, the Partnership gained ownership over Properties 555 and Properties 808, among other entities.  The IPO consisted of the sale of 36,510,000 shares of common stock in MPI at a price per share of $19.  This generated proceeds of approximately $693.7 million.  MPI transferred the net proceeds to the Partnership, in exchange for which the Partnership transferred 77.2% of its operating

units to MPI.  The refinancing proceeds, combined with the IPO proceeds, created a pool of funds totaling approximately $1.5 billion which were contributed to the Partnership.  None of the refinancing required a personal guarantee from Maguire, and the use of the IPO and refinancing proceeds to pay off Maguire Organization debt released Maguire from personal guarantees of approximately $953.1 million.  The Partnership used $42.8 million of the net IPO proceeds and $280 million of the refinancing proceeds -- the total amount of the new Bank of America loans to Properties 555 and Properties 808 -- to pay off and replace the prior debt held by MP-555 and MP-808 on the Tower and Garage, including the Mezzanine Loan.

By two Grant Deeds dated June 30, title to the Tower was transferred from Partners 555 to Properties 555, and title to the Garage was transferred from Partners 808 to Properties 808.[6]  On July 2, and on the instructions of Anthracite, Midland demanded payment of a Supplemental Exit Fee for the first time.  MP-505, MP-808, and Maguire declined to pay the Supplemental Exit Fee, and on July 10, filed terminations of the UCC-1 Financing Statements with the California Secretary of State.  On July 31,

---

[6]  Both Grant Deeds use identical form language to describe the transaction.  The Grant Deed relating to the Tower states: "<u>For value received</u>, Maguire Partners - 555 West Fifth, LLC . . . grants to Maguire Properties - 555 W. Fifth, LLC . . . , all right, title and interest in and to that certain real property . . . described on Exhibit A . . . ." (Emphasis supplied.)  An asterisk next to a declaration of zero transfer tax on the Grant Deeds leads to the following statement: "The Grantor and Grantee in this conveyance are comprised of the same parties who continue to hold the same proportionate interest in the property, R & T 11923(D)."

Anthracite caused to be filed UCC-5 Correction Statements with the California Secretary of State stating that the Mezzanine Loan borrowers had failed to satisfy their obligations under the Mezzanine Loan.

Anthracite's Claims

In its First Amended Complaint ("Complaint"), Anthracite brings eight causes of action. Its first two claims are for breach of contract against MP-555 and MP-808, and Maguire, for MP-555's and MP-808's failure to pay the Supplemental Exit Fee, and Maguire's failure to cover such fee as guarantor for the Mezzanine Loan. Anthracite's third and fourth claims are for breach of the implied covenant of good faith and fair dealing by MP-555 and MP-808, and Maguire. Anthracite's fifth claim for foreclosure of pledged membership interests and pledged stock held by MPI, the Partnership, and the "ABC Corporations" has been dropped as MPI and the Partnership were voluntarily dismissed as defendants by Anthracite to preserve diversity and claims against other unidentified corporations have not been pursued. Anthracite's sixth claim is for conversion against all defendants, while its seventh claim is for fraudulent transfer against MP-555 and MP-808 for the transfer of their ownership interests in Partners 555 and Partners 808 to the Partnership. Anthracite's final claim is for a declaratory judgment regarding the defendants' liability for the Supplemental Exit Fee.

Procedural History

Anthracite initiated this action on July 15, 2003, and filed the First Amended Complaint on August 12. On November 14, Anthracite's claims against MPI and the Partnership were dismissed at Anthracite's request to preserve diversity. The defendants' motion to dismiss was denied on January 7, 2004. Anthracite Capital, Inc. v. MP-555 West Fifth Mezzanine, LLC, No. 03 Civ. 5219 (DLC), 2004 WL 27722, at *4 (S.D.N.Y. Jan. 7, 2004). Following discovery, both sides cross-moved for summary judgment, and Anthracite moved to exclude the testimony of proffered defense expert Dallas E. Lucas.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the court must view all facts in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of the

movant's pleadings.  Rule 56(e), Fed. R. Civ. P.; <u>accord</u> <u>Burt</u>
<u>Rigid Box, Inc. v. Travelers Property Cas. Corp.</u>, 302 F.3d 83, 91
(2d Cir. 2002).


<u>Anthracite's Breach of Contract Claims</u>

     It is undisputed that the Loan Agreement is governed by New
York law.  "In cases of contract interpretation, it is well
settled that when parties set down their agreement in a clear,
complete document, their writing should be enforced according to
its terms."  <u>South Road Assocs., LLC v. Int'l Bus. Machines</u>
<u>Corp.</u>, 4 N.Y.3d 272, 277 (2005) (citation omitted).  "This
principle is particularly important in the context of real
property transactions, where commercial certainty is a paramount
concern, and where the instrument was negotiated between
sophisticated, counseled business people negotiating at arm's
length."  <u>Id.</u> (citation omitted).  "It is also important to read
the document as a whole to ensure that excessive emphasis is not
placed upon particular words or phrases."  <u>Id.</u>

     A contract is unambiguous when it has a "definite and
precise meaning, unattended by danger of misconception in the
purport of the contract itself, and concerning which there is no
basis for a difference of opinion."  <u>Krumme v. West Point</u>
<u>Stevens</u>, 238 F.3d 133, 139 (2d Cir. 2000) (citation omitted).
Where contract language is unambiguous, the intent of the parties
must be gleaned from the agreement.  <u>Poznik v. Froebel</u>, 766
N.Y.S.2d 877, 878 (2d Dep't 2003).  Unambiguous contract terms

"are given their plain meaning." Krumme, 238 F.3d at 139
(citation omitted).  On the other hand, contract language is
ambiguous if it is "capable of more than one meaning when viewed
objectively by a reasonably intelligent person who has examined
the context of the entire integrated agreement." Id. (citation
omitted).

It is also undisputed that the obligation to pay a
Supplemental Exit Fee is governed by Section 2.6(k) of the Loan
Agreement, which makes payment due upon a "sale," specifically a
sale "of all or any portion of the Property by the Companies."
The Companies are defined as Partners 555 and Partners 808.  Due
to the centrality of this provision of the Loan Agreement, the
relevant text of Section 2.6(k) is repeated here:

> Borrowers shall pay to Mezzanine Lender . . . a
> supplemental exit fee ("the Supplemental Mezzanine
> Component A Exit Fee"), payable upon one or more sales
> of all or any portion of the Property by the Companies
> (each, a "Supplemental Exit Fee Triggering Event");
> provided, however, that no such Supplemental Mezzanine
> Component A Exit Fee shall be due from Borrowers unless
> and until, at the time the particular Supplemental Exit
> Fee Triggering Event occurs, the sum of (i) the
> Supplemental Exit Fee Purchase Price then due, (ii) any
> prior Supplemental Exit Fee Purchase Price previously
> paid to the Companies and (iii) the value of the
> portion of the Property remaining after the current
> Supplemental Exit Fee Triggering Event . . . is equal
> to or greater than $425,000,000 . . . .  For the
> purposes of the foregoing, "Supplemental Exit Fee
> Purchase Price" means the gross purchase price of all
> or a portion of the Property, including without
> limitation all cash proceeds, non-cash proceeds, any
> over-market purchase money financing or any other
> consideration to the Companies or the Borrowers
> (provided that any and all consideration received shall
> be payable only to the Companies or the Borrowers) that
> is reasonably attributable to the Property . . . .

(Emphasis supplied.)

As discussed in the Opinion addressing the defendants'
motion to dismiss, although the Loan Agreement does not define
the term "sale," the ordinary meaning of that term is "the
transfer of property or title for money or other consideration."
Anthracite, 2004 WL 27722, at *2.  As the Loan Agreement itself
reflects, the application of this ordinary meaning is
appropriate.  Section 2.6(k) requires a payment of a Supplemental
Exit Fee only when the amount payable on sale is $425 million or
greater.

The Loan Agreement also uses the term "consideration" in the
Section 2.6(k) discussion of the Supplemental Exit Fee.  Payment
of a Supplemental Exit Fee is only required when the sum of three
calculations is $425 million or greater.  One of the three
components is the "Supplemental Exit Fee Purchase Price then
due," which is defined as the Tower's and Garage's purchase
price, including "all cash proceeds, non-cash proceeds, any over-
market purchase money financing or any other consideration to the
Companies or the Borrowers (provided that any and all
consideration received shall be payable only to the Companies or
the Borrowers) that is reasonably attributable to" the Tower and
the Garage.  (Emphasis supplied.)  The consideration contemplated
in Section 2.6(k) plainly is part of a "purchase price" and is
that which can be "payable" to MP-555, MP-808, Partners 555, or
Partners 808.[7]

_____

[7]  Further review of Section 2.6(k) indicates that the
January 6, 2004 Opinion's interpretation of the parenthetical
provision restricting consideration to that which is "payable

16

There is no dispute that Partners 555 transferred title to the Tower to Properties 555, and that Partners 808 transferred title to the Garage to Properties 808. Anthracite has offered insufficient evidence, however, to raise a question of fact that any consideration of the type contemplated in Section 2.6(k) was paid in exchange for the transfer of title to the Tower and Garage.[8] By contrast, the defendants have offered undisputed evidence that title to the Tower and Garage was transferred from one single purpose entity to another single purpose entity without payment of any money or other consideration -- either to "the Companies or the Borrowers," to wit, Partners 555 and 808, MP-555, and MP-808 -- or to any other party, for that matter.

only to the Companies or the Borrowers" was excessively generous to Anthracite. The parenthetical provision would be meaningless if it applied only to the subset of examples in the definition as the January 6 Opinion stated, because it would be trumped by the earlier "including without limitation" qualifier. Such an interpretation also would circumscribe unnecessarily the unlimited language "any and all consideration received." The only way to construe this provision to give meaning to the entire clause is to apply the parenthetical restrictive language to "any and all consideration" encompassed by the definition of the "Supplemental Exit Fee Purchase Price then due."

It should be noted that although this results in an additional ground for granting summary judgment to the defendants, Anthracite independently has failed to show that a sale of interests in the Property is encompassed by Section 2.6(k)'s requirement of a sale of the Property as demonstrated below. Summary judgment in favor of the defendants on the breach of contract claim is appropriate for that reason regardless of how the parenthetical restriction is interpreted.

[8] Indeed, the only evidence that Anthracite has mustered to show consideration associated with this transfer is the form language recital written on the face of the Grant Deeds stating that the transfer was "[f]or value received." There is no indication in the record to support that any consideration was actually paid for the transfer -- a conclusion endorsed by Anthracite's own expert, David M. Ellis.

The only reason either party has offered for these transfers is that they were effected merely so that the Maguire Organization could comply with technical refinancing requirements. The Grant Deeds recognized that the grantor and grantee "are comprised of the same parties." Because there is no material issue of fact as to whether consideration was paid in exchange for the transfer of title to the Tower and Garage, the defendants must prevail on their summary judgment motion on the breach of contract claim against MP-555 and MP-808. Because Anthracite's claim for breach of contract against MP-555 and MP-808 fails, its claim against Maguire for breach of contract fails since that claim is predicated on Maguire having improperly withheld payment as guarantor.[9]

Anthracite contends that the pre-payment of the loan extended to MP-555 and MP-808 must be viewed in the context of the IPO and Formation Transactions, and that these events collectively constitute a single transaction. In that context, Anthracite argues that two additional factors are relevant: first, that the Formation Transactions transferred effective control over the entities that owned the Tower and Garage from Maguire to the Partnership, and second, that such a transfer of effective control was in exchange for the Partnership using IPO

---

[9]  Judgment in favor of the defendants on this question also requires judgment in favor of the defendants on Anthracite's eighth cause of action for a declaratory judgment regarding the defendants' liability for the Supplemental Exit Fee. It is unnecessary to rely upon the testimony of defense expert Dallas E. Lucas, and therefore Anthracite's motion to exclude the expert testimony is denied as moot.

proceeds received from MPI, along with refinancing proceeds received from, among others, Bank of America, to pay off debt owed to, among others, Anthracite and guaranteed by Maguire. Under this view, Anthracite contends that an "effective sale" took place because there was a change in the indirect owner of the Tower and Garage in exchange for consideration in the form of payments releasing various debts.

Anthracite's argument fails. It has shown only that there was a sale of an indirect owner of the properties. The payment of consideration to change the identity of the person with a controlling interest in the entity holding title to the Tower and Garage is not the payment of consideration contemplated by Section 2.6(k).[10] The Loan Agreement unambiguously stipulates that the Supplemental Exit Fee is payable upon a sale of the "Property," not a sale of interests in the Property. Reading the Loan Agreement as a whole further confirms this conclusion. For example, Section 7.2(a) requires the prior written consent of the Mezzanine Lender "in its sole and absolute discretion" for the transfer of "any direct or indirect interest in any of the Borrowers or the Companies," while Section 7.2(c) requires similar written consent for "any Transfer of the Property or the

---

[10] Indeed, the distinction between the real estate and the entity that holds the real estate is critical in the field of mezzanine loans, when, for example, a borrower defaults and the lender forecloses on the collateral. In such cases, the lender forecloses on the shares of the entity controlling the real estate, not the real estate itself. Proceedings in which a lender forecloses on personal property as opposed to real property are typically far more expeditious.

Collateral or any portion of either of them." The arm's length
negotiations produced a comprehensive Loan Agreement exceeding
eighty pages that clearly contemplates transfers of direct or
indirect interests in the Companies or Borrowers as distinct from
transfers of the Property itself. That Section 2.6(k)
specifically mentions "one or more sales of all or any portion of
the Property," but fails to include a sale of any interest in the
Borrowers or the Companies, further emphasizes that the parties
did not intend the sweeping definition of "sale" in Section
2.6(k) that Anthracite now advances.

Similarly, Anthracite's argument that the Partnership's pre-
payment of the debt, using IPO proceeds and refinancing monies,
is payment of consideration for the sale of the Tower and Garage
misses the mark. The loan pre-payment was not money paid to MP-
555, MP-808, Partners 555, or Partners 808. Nor was the pre-
payment associated with the purchase of the Tower and Garage.
Indeed, it is circular to classify the act of pre-payment itself
as a triggering event for calculating whether a supplemental fee
must be paid at the time of pre-payment.

Anthracite's resort to California and New York tax laws does
not save its breach of contract claim. Anthracite cites
California cases (which cannot provide rules for interpreting an
agreement with a clause expressly choosing New York law)
addressing the tax consequences of "change of ownership," see
Sav-On Drugs, Inc. v. County of Orange, 190 Cal. App. 3d 1611,
1617-18 (1987); Title Ins. and Trust Co. v. County of Riverside,

48 Cal. 3d 84, 92-93 (1989), as well as New York tax law governing the "conveyance" of real property, N.Y. Tax Law §§ 1401(e) & 1402(a), and "real estate investment trust transfer," N.Y. Tax Law § 1402(b).  These arguments do not address the definition of a "sale."  Moreover, they inappropriately attempt to mine a specialized field of law for use as a general rule of contract interpretation, and do not affect an evaluation of the parties' intent as expressed in the text of the Loan Agreement.

Anthracite's Remaining Claims

Anthracite's remaining claims fail as a result of the judgment in favor of the defendants on the question of whether the defendants owed a Supplemental Exit Fee.  These claims are for breach of the implied covenant of good faith and fair dealing, conversion, and fraudulent transfer.

1.  Implied Covenant of Good Faith and Fair Dealing

Under New York law, the duty of good faith and fair dealing may be implied in a contract "in aid and furtherance of other terms of the agreement of the parties."  Murphy v. American Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983).  "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship."  Id.  See also Horn v. New York Times, 790 N.E.2d 753, 756 (N.Y. 2003).  Ultimately, a claim based on the implied covenant of good faith and fair dealing "may not be used as a substitute for a nonviable claim of breach of

contract."  <u>Sheth v. N.Y. Life Ins. Co.</u>, 709 N.Y.S.2d 74, 75 (1st Dep't 2000).

Anthracite cannot successfully claim a breach of the implied covenant of good faith and fair dealing based on the defendants' refusal to pay the Supplemental Exit Fee where such payment was not required by the Loan Agreement, as it would be inconsistent with Section 2.6(k) of the Agreement.  To the extent that Anthracite bases this claim on the defendants' refusal to allocate Partnership units based on the value generated by each property interest in the Partnership, thereby making it difficult for Anthracite to estimate the "sale price" of the Tower and Garage, such a claim is irrelevant because the sale contemplated by the Loan Agreement did not take place.  Therefore, summary judgment on Anthracite's third and fourth claims for breach of the implied covenant of good faith and fair dealing by MP-555, MP-808, and Maguire, is granted in favor of the defendants.

2.  <u>Conversion</u>

Under New York law, "[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession."  <u>LoPresti v. Terwilliger</u>, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted).  A tort claim such as conversion "will not arise where plaintiff is essentially seeking enforcement of the bargain."  <u>In re Chateaugay Corp.</u>, 10 F.3d 944, 958 (2d Cir. 1993) (citation omitted).  Moreover, a claim for conversion will

not arise where the claim involves appropriation of "intangible property." Sporn v. MCA Records, Inc., 58 N.Y.2d 482, 489 (1983).

Anthracite claims that because the defendants filed UCC termination statements in order to transfer property interests, they improperly terminated Anthracite's security interest without Anthracite having released its lien on the collateral. This conversion claim depends on whether the defendants wrongfully failed to pay a contractual fee that was owing. Because the defendants did not owe additional payments, Anthracite's conversion claim for the security interest is without merit; it is simply a failed contract claim masquerading as a tort claim. In any event, the security interest is intangible property and is not subject to a conversion claim. Consequently, summary judgment on Anthracite's sixth claim for conversion is granted to the defendants.

## 3.  Fraudulent Transfer

Under New York law, a transfer constitutes a constructive fraudulent conveyance if it is made without fair consideration, N.Y. Debt. & Cred. Law § 272, and (1) the transferor is insolvent or will be rendered insolvent, id. § 273, (2) the transferor will be left with unreasonably small capital, id. § 274, or (3) the transferor intends or believes that it will incur debts beyond its ability to pay as they mature, id. § 275. The fraudulent conveyance statute provides for remedies as long as the plaintiff

is a creditor with a claim that either has, or has not, matured. Id. §§ 278-79. Where the claim has not matured, the creditor may take legal action to restrain the conveyance. Id. Where the plaintiff cannot establish that it is a bona fide creditor, it is not entitled to relief based on fraudulent conveyance. Oparaji v. Madison Queens Guy Brewer, LLC, 754 N.Y.S.2d 907, 907 (2d Dep't 2003).

Anthracite advances a fraudulent conveyance claim based on the theory that the Partnership paid less than fair consideration for the Tower and Garage. This claim fails because Anthracite cannot establish that it is a creditor with a claim, since it is not entitled to collect the Supplemental Exit Fee.[11] Therefore, summary judgment on Anthracite's seventh claim for fraudulent conveyance is granted to the defendants.

---

[11] Anthracite also acknowledges that it had full notice of, and approved, the pre-payment transaction by the defendants, and only caused Midland to assert that a Supplemental Exit Fee was owing five days after the transaction was completed.

## CONCLUSION

The defendants' summary judgment motion is granted, Anthracite's summary judgment motion is denied, and Anthracite's motion to exclude expert testimony is denied as moot. The Clerk of Court shall close the case.

SO ORDERED:

Dated:     New York, New York
           May 17, 2005

_____
DENISE COTE
United States District Judge